**In re the MARRIAGE OF Roger L. BERKBIGLER,**
**Petitioner-Respondent,**

**and**

**Elizabeth M. Berkbigler,**
**Respondent-Appellant.**

No. 37544.

Missouri Court of Appeals,
St. Louis District.

Nov. 22, 1977.

Alfred J. Rathert, Fenton, for respondent-appellant.

Harry Gershenson, Jr., Clayton, for petitioner-respondent.

RENDLEN, Special Judge.

This marriage was dissolved on the husband's petition and the wife appeals, contending: (1) the evidence was insufficient to support the judgment of dissolution, (2) error in the court's failure to order child support for the eldest of five minor children of the marriage and (3) in denying appellant's request for maintenance. The parties shall be referred to as denominated in their roles on appeal.

Married in 1952 and separated in February 1975, the parties have six children, five of whom were minors, ranging from eight to eighteen and one-half years of age at the

time of the dissolution in September, 1975. The sixth child, a married adult, is a member of the United States Air Force stationed in Texas.

We first consider appellant's contention that the trial court erred ordering the dissolution because appellant had denied under § 452.320, subd. (2), RSMo Supp. 1975, that the marriage was irretrievably broken and respondent failed to carry his resultant burden to present evidence, sufficient to "satisfy the court" that one or more of the ultimate facts, prescribed in subsection 452.320, subd. 2(1)(a)–(e), were present. Of the ultimate facts enumerated in the subsection, respondent offered evidence only as to one; i. e., 2(1)(b), "That the [wife] has behaved in such a way that the [husband] cannot reasonably be expected to live with [her]".

Respondent testified that continued cohabitation with appellant was intolerable because of her constant carping, criticism and nagging which frequently related to his relationship with the children and occasionally occurred in their presence. As respondent described it, "there was constant complaining and criticizing. We could never agree on any subject". He compared the incessant questioning by his wife to being "on the witness stand" stating that "Mrs. Berkbigler complained about me, no matter what I did practically, and it was in front of the children." At times the arguments reached the point that respondent would refuse to answer further and would just "be quiet." One area of disagreement involved sending the girls to Catholic high school which he opposed because "I felt we were paying for high schools and taxes I was paying—I didn't see why we should pay another high school"; on the other hand appellant was "determined" they should attend parochial school. Another fertile source of disagreement concerned his membership and attendance at meetings of several business or professional organizations. Respondent had been a member and during one year chairman of the St. Louis section of the "Society of Auto Engineers". He was also a member of the Planning and Zoning Commission and an officer in the "Ramsey Old Guard Association", an organ-

ization that planned activities for "families of the company" where he worked. His wife complained about his attendance at meetings of these organizations because "they were for somebody else" and that he "should be spending this time at home with her and the children." Often during these "nearly constant" exchanges she yelled at him which produced "bitterness" continuing until the separation when he left home in February, 1975. Their quarreling also concerned the fact that respondent stayed out and drank "about every other Friday", sometimes until 12:00 midnight. On one occasion she told the children (according to respondent quite unjustifiably) that respondent did not love them. Appellant admitted that she at times argued with respondent "to the point that he would no longer answer [me] at all", and though she contends they didn't argue more than ordinary married couples she complained he wasn't home enough and that he had little time for the children. In spite of their problems, appellant believed they could "get over" their difficulties and preserve the marriage. These were matters for the trial court to weigh and evaluate in the light of the witness' credibility.

Appellant cites *In Re Marriage of Mitchell*, 545 S.W.2d 313 (Mo.App.1976), as authority for reversal; however, factual differences distinguish that case from this at bar. In *Mitchell* there was no testimony that the quarrels of which the petitioning husband complained were the bases for his belief he could not reasonably be expected to live with his wife. As stated by the court "never once during petitioner's testimony did he complain that it was these 'quarrels' or 'discussions' which made it unreasonable to expect petitioner to live with the respondent." This stands in marked contrast to the testimony here. The facts which respondent alleged in his petition made the marriage intolerable were those to which he testified in great detail and which were the stated reasons for his belief that there was no "reasonable likelihood" the marriage could be preserved and that the marriage was "irretrievably broken". This is not to say that the record was bare

of evidence concerning many good qualities of his wife, which indeed respondent admitted, nor was *his* conduct above reproach. He admitted that on two occasions in past years he had had associations with certain other women and he also admitted having associated with another woman following the separation in 1975. While such conduct does not commend itself, it does not preclude the court's finding that appellant had behaved in such a way that the respondent "cannot reasonably be expected to live with" her. We are unable to say there was no substantial evidence to support the finding or that the judgment of dissolution was against the weight of the evidence.

Appellant next contends the trial court erred by failing to make an award of maintenance. In determining the merit of this contention we examine the nature and value of marital property apportioned to each party, the ability of each to support themselves through appropriate employment, and all relevant factors set forth in § 452.-335, RSMo Supp. 1975. The marital property was divided by the court as follows:[1]

### APPELLANT–WIFE

| | | | |
|---|---|---|---|
| 1. | Family Home in Fenton | $45,000 | |
| | Mortgage | 20,200 | |
| | Equity | | $24,800 |
| 2. | Household Goods | | 1,000 |
| 3. | 1972 Ford Station Wagon | 1,300 | |
| | Mortgage | 800 | |
| | | | 500 |
| | | | $26,300 |

### RESPONDENT–HUSBAND

| | | | |
|---|---|---|---|
| 1. | 1970 Buick (estimated value varied from $825 to $1,000) | | $825 to $1,000 |
| 2. | 1960 Valiant | | 50 |
| 3. | Savings Account, Mutual Fund | | 294 |
| 4. | Corporate Stock | | 1,772 |
| 5. | Tools | | 225 |
| 6. | Undeveloped lot subject to mortgage, because of disparity in the testimony, the value of the equity ranges from $0 to $700 | 0 to | 700 |
| | | | $3,166 to $4,041 |

Debts apparently assumed by respondent include: (1) Equitable Life Insurance Company, $1,079; (2) amount due on air compressor (apparently to Sears), $190; (3) Master Charge, $875; (4) Penney's, $150; (5) Ramco Credit Union, $794; (6) fees due to appellant's attorney (The judgment states: "$500 additional to respondent's attorney"), $500; all of which total $3,588.

Respondent's net monthly earnings (including amounts he allocated to a savings program) provides spendable income of $1,076 per month. Against this income, respondent testified to monthly expenses of $1,195.[2] In addition, as set out above, the court allowed $468 monthly child support, making respondent's monthly liability (not including the outstanding indebtedness listed above due unsecured creditors) of $1,663, less such amounts, if any, as appellant pays on the monthly home mortgage, property taxes and insurance of $454.23.

1. Certain evidentiary inconsistencies as to value are noted and except where contrary testimony was offered the income and expense statement and financial statement filed by respondent supply much of the information on which the judgment rests.

2. This includes monthly mortgage payments, property taxes and insurance expenses on the home of $454.23 for which the court made no specific allowance nor does there appear to have been any agreement by which appellant, who is to receive the real estate, was to hold respondent harmless. On the other hand, if these items are paid in part by her, such payments would correspondingly reduce his claimed monthly expenses.

■ Appellant's monthly income at the time of trial included $218 wages and $76 unemployment benefits which will be augmented by $468 monthly child support payments. She will thus receive $762 per month from these sources. Appellant testified to monthly expenses totaling $899 after credit for $30 a month on the children's insurance premium which respondent is obligated to provide under the court's decree. Both parties recited expenses, greater than available income, and it is readily apparent there will be some diminution in their respective life styles when maintaining separate homes. Against this background, we consider the prospect for appellant to support herself through appropriate employment. Appellant is in good health, had been employed full time during 1974–1975, and though at the time of trial she was employed only 24 hours per week as a clerk typist at Ultradec Incorporated, she was seeking a full time job. Admitting the necessity for a full time job to pay her bills, appellant first testified she would refuse such employment if it were offered but later conceded she would accept full time work and had applied for such employment.[3] Though appellant felt a need to improve her skills, her background and job experience in typing, shorthand, use of dictation equipment, etc., qualified her for secretarial work. We are not told of her earlier job experience except that in 1974 she worked at the Maritz Corporation as a secretary earning about $380 per month until June of 1975. She also had worked part time selling cosmetics. In view of the marital property award, appellant's skills and prospects for appropriate employment, the age and situation of the children in the family home, the present earnings and capabilities of the parties and other relevant factors including those set forth in § 452.-335, RSMo Supp. 1975, etc., we cannot say the trial court abused its discretion in failing to award appellant maintenance.

■ Finally, it is contended the court erred in not granting child support for Janet, the parties' daughter who was then almost nineteen years of age. This young lady, a student at Miss Hickey's College studying fashion design, attended class from 9:00 a. m. to 1:00 p. m. daily and expected to complete school by July of 1977. She had an application in process for a student loan and was employed at the Venture Store earning $2.25 per hour working between twenty and forty hours per week. Respondent had supplied Janet with a car and she purchased her own gasoline, lunches, insurance, long distance calls and personal clothing, most of which she made. She had not been paying her mother room or board. Considering all the circumstances, we find no error in the decree awarding support for only the four younger children.

The judgment is affirmed.

McMILLIAN, P. J., and STEWART, J., concur.

---

**3.** Appellant stated she would refuse full time employment because she was "needed at home". However, she had worked full time in 1974–1975 when the youngest child was six years of age, yet that child was a third grader, eight years old, at the time of the divorce. Appellant further testified that the next child, a boy twelve years of age, was able to take care of himself fairly well and the children helped take care of one another.